IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ANDREW W. JAMES,

                       Plaintiff,

     v.

OREGON SANDBLASTING &
COATING, INC.,

                       Defendant.

No. 3:15-cv-01706-HZ

OPINION & ORDER

John D. Burgess
Carl Lee Post
Daniel J. Snyder
LAW OFFICES OF DANIEL SNYDER
1000 SW Broadway, Suite 2400
Portland, OR 97205

       Attorneys for Plaintiff

Allyson S. Krueger
Alyssa R. Engelberg
DUNN CARNEY ALLEN HIGGINS & TONGUE, LLP
851 SW Sixth Avenue, Suite 1500
Portland, OR 97204

       Attorneys for Defendant

1 - OPINION & ORDER

HERNÁNDEZ, District Judge:

Plaintiff Andrew W. James brings this employment discrimination case against his former employer, Defendant Oregon Sandblasting & Coating, Inc. Plaintiff alleges discrimination based on his disability and injured worker status, in violation of the Americans with Disabilities Act , 42 U.S.C. §§ 12101-12213 (ADA); Oregon Rehabilitation Act, Oregon Revised Statute §§ (O.R.S.) 659A.103-659A.145 (ORA); and O.R.S. 659A.040. Defendant moves for summary judgment on all claims. The Court grants Defendant's motion as to Plaintiff's hostile work environment claim and otherwise denies Defendant's motion.

## BACKGROUND

In January of 2009, Defendant hired Plaintiff as a sandblaster. James Decl. ¶ 3, ECF 43. According to Kenton Cudd, Defendant's shop superintendent, Plaintiff was a good sandblaster, had good attendance, and had an "unremarkable" employment history with Defendant. Cudd Decl. ¶¶ 5-6, ECF 32. Plaintiff worked for Defendant until he resigned in April of 2014. James Decl. ¶ 20.

## I.     Plaintiff's Dyslexia

Plaintiff asserts that he is dyslexic and, as a result, he can barely read or write. James Decl. ¶ 2. He declares that he is able to write something down only if he is shown the letters and they are sufficiently spaced so that he can identify them and copy them. Id. He states that he cannot read street names on signs. Id. He has his children read messages to him and type messages on his behalf. Id.

On or about the same date that Plaintiff was hired, Plaintiff told Mr. Cudd that he is dyslexic and that he needed assistance reading and writing. Id. ¶ 3. Id. Plaintiff also informed

Lanita Franklin in Human Resources that he is dyslexic. Id at ¶ 4. Ms. Franklin helped Plaintiff

fill out his initial paperwork. Id. Approximately six months after being hired, Plaintiff informed

Jason Crawford, the son of Defendant's owner, that he is dyslexic and needed help filling out

timecards and paperwork. Id. at ¶ 5.

At the beginning of each of Plaintiff's shifts, Mr. Cudd or Mark Constance provided

Plaintiff with a "job sheet" of tasks that needed to be completed. Id. at ¶ 6. Plaintiff was also

required to fill out a timecard. Id. Plaintiff could not read the job sheet or timecard. Id. Therefore,

his coworkers assisted him with completing his timecard and his supervisor instructed him to just

copy what was on the job sheet onto his timecard. Id.

In December of 2011 or January of 2012, Geoffrey Goldspink became Plaintiff's

supervisor. Cudd Decl. ¶ 4. According to Plaintiff, Mr. Goldspink made derogatory comments

about Plaintiff's dyslexia on a weekly basis. James Decl. ¶ 10. Specifically, Plaintiff declares that

Mr. Goldspink accused Plaintiff of being lazy and mocked him due to his dyslexia. Id.

## II.    Plaintiff's Request To Be a Painter

In approximately 2011, Plaintiff began requesting to be trained, and eventually

transferred, to be a painter within Defendant's operations. Id. at ¶ 12. According to Plaintiff,

painting was more desirable than sandblasting because the work was less physically demanding,

it frequently occurred indoors, the pay was better, and the opportunities for advancement were

better. Id.

In approximately October of 2012, Plaintiff received some training in painting. Id. at

¶ 16. However, around the same time, Mr. Goldspink said to him, "I don't know why you want

to go into paint. I can't believe you want to move into paint when you can't even read paint

3 - OPINION & ORDER

labels. Why would they consider moving you when you can't read the paint colors?" <u>Id.</u> at ¶ 15.
In approximately March of 2013, Mr. Goldspink stopped allowing Plaintiff to work on the paint
side of the operation and he told Plaintiff, "You're the one who screwed yourself out of the paint
department because you keep playing up your disability that you can't read." <u>Id.</u> at ¶ 17.

### III.    Plaintiff's Injuries

In May of 2013, Plaintiff injured his back at work. <u>Id.</u> at ¶ 18. Mr. Goldspink told him:
"If you file a workmen's comp claim, you will be terminated. You're being paid to blast. If you
don't get your ass back in the blast room, you'll be fired." <u>Id.</u> Because Plaintiff was afraid, he did
not file a workers' compensation claim. <u>Id.</u>

In October of 2013, Plaintiff injured both of his shoulders at work. Once again, he
reported the injury to Mr. Goldspink. <u>Id.</u> at ¶ 19. Mr. Goldspink said, "we have too many
workman's comp claims," and Defendant's insurance premiums would increase if any more
claims were filed. <u>Id.</u> Mr. Goldspink also said to Plaintiff: "If you file a claim you will be
terminated. If you talk to Kenny Cudd or Lanita about it, you will be terminated." <u>Id.</u> Because of
Mr. Goldspink's threat, Plaintiff did not report the injury to anyone else or file a claim. <u>Id.</u>

By April of 2014, Plaintiff was not able to tolerate the pain of his injuries anymore. <u>Id.</u> at
¶ 20. Because Mr. Goldspink had told him that he would be fired if he reported his injuries,
Plaintiff felt that he had no choice but to resign from his position. <u>Id.</u> at ¶ 21.

### STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact
and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The
moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## DISCUSSION

Plaintiff alleges that he faced discrimination due to his disability and his injured worker status. Plaintiff brings four claims: (1) discrimination in violation of the ADA; (2) retaliation in violation of the ADA; (3) discrimination in violation of the ORA; and (4) injured worker

discrimination and retaliation in violation of O.R.S. 659A.040. Defendant moves for summary judgment on all claims.

## I.    Evidentiary Objections

Defendant raises numerous objections to evidence that Plaintiff relies on in opposing Defendant's motion. Relevant objections are discussed below, in the context of the particular issue in which the evidence is relied upon. All other evidentiary objections are denied as moot.

## II.    Plaintiff's ADA and ORA Claims—Claims 1, 2, and 3

The ADA and the ORA prohibit discriminating against qualified individuals on the basis of disability in the terms and conditions of their employment. 42 U.S.C. § 12112(a); O.R.S. 659A.112(1). The standards for analyzing the federal and state claims are the same. O.R.S. 659A.139 (state statute to be construed "to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act"); Snead v. Metro. Prop. & Cas. Ins. Co., 237 F.3d 1080, 1087 (9th Cir. 2001); Henderson v. Jantzen, Inc., 79 Or. App. 654, 657, 719 P.2d 1322, 1324 (1986). Therefore, the Court uses the same analysis for Plaintiff's federal and state law disability discrimination claims.

Plaintiff brings three claims under the ADA and the ORA in which he asserts various legal theories for relief: hostile work environment, discrimination on the basis of a disability, disparate treatment, failure to accommodate, failure to engage in the interactive process, and retaliation. Defendant challenges all of Plaintiff's theories. The Court first addresses the issues raised by Defendant that apply to all of Plaintiff's theories for relief and then addresses each theory separately, to the extent necessary.

A.  Plaintiff's Disability

Disability, with respect to an individual, is defined in the ADA as (1) a physical or mental impairment that substantially limits one or more major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(1). The definition of disability is to be broadly construed. 42 U.S.C. § 12102(4)(A).

Plaintiff contends that he is dyslexic and, thus, is disabled. Alternatively, he asserts that he has a record of a disability or was regarded by Defendant as disabled. Defendant challenges each of Plaintiff's alternative theories for claiming he is disabled.

Plaintiff asserts that his dyslexia impairment limits his major life activity of reading. James Decl. ¶ 2, ECF 43. In his declaration, Plaintiff describes how he cannot read anything other than a small number of familiar words and he cannot spell words just by hearing them. Id. at ¶ 2. When he attempts to identify letters or words, he transposes letters such as "b" and "d." Id. He is "all but unable to read or write." Id.

During his July 13, 2016 deposition, Plaintiff testified that he did not currently have any documentation of a diagnosis of dyslexia. Krueger Decl. Ex. 2 ("Pl. Depo") at 73:14-18. Plaintiff testified that he was told in junior high school that he is dyslexic. Id. at 73:1-13, ECF 34-2. In addition, he testified that he was tested and diagnosed with dyslexia in Nebraska in 2001. Id. at 68:8-19. Plaintiff testified that he received paperwork concerning his dyslexia diagnosis from the Nebraska organization but he no longer has the paperwork. Id. at 72:12-20.

In addition to his own testimony, Plaintiff submits two medical reports to support a finding that he is disabled. Dr. Frances Verzosa, who examined Plaintiff in connection with a work injury on August 14, 2014, noted that Plaintiff "has a history of dyslexia." Burgess Decl.

Ex. 3 at 2, ECF 42-3. Dr. Christopher Corbett, clinical psychologist, examined Plaintiff on

September 15, 2016, and diagnosed Plaintiff with "Specific Learning Disorder" with impairment

in reading and written expression. Burgess Decl. Ex. 1 ("Corbett Report") at 9, ECF 42-1. Dr.

Corbett explained that Plaintiff's "history, presentation and testing are consistent with Specific

Learning Disorders in Reading and Written Expression with a tendency to reverse letters and

perceive letters out of order which is commonly referred to as dyslexia." Id.

    Defendant attacks the admissibility of Dr. Verzosa's statement and Dr. Corbett's report.

Defendant contends that Dr. Verzosa's statement is inadmissible hearsay. Plaintiff responds that

"Dr. Verzosa's statement was a statement by a treating physician and is thus not hearsay."

Plaintiff's Sur-reply 8, ECF 50.

    Federal Rule of Evidence 803(4) provides that the following is not excluded by the rule

against hearsay, regardless of whether the declarant is available as a witness:

> (4) Statement Made for Medical Diagnosis or Treatment. A statement that:
>
> > (A) is made for--and is reasonably pertinent to--medical diagnosis or treatment; and
> > (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause.

Fed. R. Evid. 803(4).

    Rule 803(4), therefore, provides for the admissibility of a statement made by a patient to

his doctor, if it meets the criteria outlined by the Rule. "The evidentiary rationale for permitting

hearsay testimony regarding . . . statements made in the course of receiving medical care is that

such out-of-court declarations are made in contexts that provide substantial guarantees of their

trustworthiness." White v. Illinois, 502 U.S. 346, 355–56 (1992). "[A] statement made in the

course of procuring medical services, where the declarant knows that a false statement may

cause misdiagnosis or mistreatment, carries special guarantees of credibility that a trier of fact

may not think replicated by courtroom testimony." Id.

 The statement Plaintiff seeks to admit in this case, however, does not satisfy the criteria

of the Rule or the evidentiary rationale for permitting statements under the Rule. Plaintiff seeks

to admit a statement made by Dr. Verzosa: "[Plaintiff] has a history of dyslexia." To the extent

Plaintiff seeks to admit Dr. Verzosa's statement as one that describes medical history, his effort

fails because "Rule 803(4) applies only to statements made by the patient to the doctor, not the

reverse." See Bulthuis v. Rexall Corp., 789 F.2d 1315, 1316 (9th Cir. 1985); see also Field v.

Trigg County Hosp., Inc., 386 F.3d 729, 735 (6th Cir. 2004) ("[T]he hearsay exception set forth

in Fed. R. Evid. 803(4) applies only to statements made by the one actually seeking or receiving

medical treatment.").

 If, on the other hand, Plaintiff seeks to admit Dr. Verzosa's statement as a written

documentation of Plaintiff's statement that he has a history of dyslexia, Plaintiff's effort still

fails. Rule 803(4) permits the introduction of statements by Plaintiff to Dr. Verzosa for the

purpose of diagnosis and treatment. Plaintiff's visit to Dr. Verzosa in 2014 was for the purpose

of diagnosis and treatment of his bilateral shoulder pain. Burgess Decl. Ex. 3 at 1, ECF 42-3.

There is no indication that a statement regarding Plaintiff's dyslexia was "made for" or

"reasonably pertinent to" diagnosis or treatment of his shoulder pain. See, e.g. United States v.

Matta-Ballesteros, 71 F.3d 754, 767 (9th Cir. 1995), opinion amended on denial of reh'g, 98 F.3d

1100 (9th Cir. 1996) (excluding statement by defendant to prison psychologist regarding his

illiteracy because it had nothing to do with the defendant's diagnosis or treatment); see also

Gong v. Hirsch, 913 F.2d 1269, 1274 (7th Cir. 1990) (declining to admit a physician's statement

under Rule 803(4) because the statement merely expressed the patient's conclusion as to the appropriate medical diagnosis). Furthermore, there is no indication that Plaintiff was qualified to diagnose himself with a history of dyslexia. If he was merely repeating a diagnosis given to him years earlier, it is hearsay. See, e.g., Frank v. Plaza Const. Corp., 186 F. Supp. 2d 420, 433 (S.D.N.Y. 2002) (finding the plaintiff could not establish she was dyslexic based solely on her own assertion to that effect and her mother's statement that she was so diagnosed). Therefore, the Court strikes Dr. Verzosa's statement as inadmissible.

Defendant also argues that Dr. Corbett's report must be stricken for failure to comply with the Federal Rules of Civil Procedure. The Court agrees. Rule 37(c)(1) provides that "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Discovery in this case closed on August 12, 2016. See Order, July 12, 2016 (adjusting the date for close of discovery and reminding parties that dates set by the Court were not subject to change), ECF 21. Despite being aware that he would have to prove disability as an element of his *prima facie* case, Plaintiff did not seek a medical evaluation until September 15, 2016.[1] Corbett Report 2. Dr. Corbett completed his report on September 19, 2016 and Plaintiff filed his Response to Motion for Summary Judgment on September 20, 2016. Id.; Pl.'s Resp., ECF 41.

Plaintiff argues that he did not think it was necessary to see a physician regarding his disability because Defendant's behavior throughout litigation, prior to the motion for summary

---

[1] Plaintiff's Response to Defendant's Motion for Summary Judgment was due on September 6, 2016; however, the Court granted Plaintiff an extension of time until September 20, 2016. There was no mention of the need for a medical evaluation in Plaintiff's motion for extension of time. See Pl.'s Mot. Ext. Time, ECF 37.

judgment, suggested that it "regarded Plaintiff as disabled." Pl.'s Sur-Reply 7, ECF 50. Even assuming Plaintiff's statement regarding Defendant's litigation behavior is true, the ADA distinguishes between having a mental impairment and being regarded as having such an impairment. Thus, any representations by Defendant that it regarded Plaintiff as disabled would not excuse Plaintiff's need to establish that he actually has an impairment, should he wish to assert an ADA or ORA claim on that basis. Plaintiff acknowledged in his July 13, 2016 that he knew he did not have any documentation of a diagnosis of dyslexia. Pl. Depo. at 73:14-18. Therefore, Plaintiff's violation of Rule 26 is not substantially justified. See Fed. R. Civ. P. 37(c)(1).

Plaintiff's violation of Rule 26 is also not harmless. Id. The Court does not speculate whether or not Defendant would have chosen to challenge Dr. Corbett's report, had it received the report sooner. However, Plaintiff's failure to obtain the report and disclose it prior to the close of discovery eliminated any such opportunity for Defendant. Therefore, the Court strikes Dr. Corbett's report.

After striking Dr. Verzosa's statement and Dr. Corbett's report, the Court is left to decide whether Plaintiff's own testimony is sufficient to raise a genuine issue of material fact as to whether he is actually disabled, as defined in the ADA. "At the summary judgment stage, 'precedent does not require comparative or medical evidence to establish a genuine issue of material fact regarding the impairment of a major life activity. . . . Rather, . . . a plaintiff's testimony may suffice to establish a genuine issue of material fact." Rohr v. Salt River Project Agric. Imp. & Power Dist., 555 F.3d 850, 859 (9th Cir. 2009) (quoting Head v. Glacier Nw., Inc., 413 F.3d 1053, 1058 (9th Cir. 2005), abrogated on other grounds in Univ. of Tex. Sw. Med.

11 - OPINION & ORDER

Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013)); see also Pesci v. McDonald, No. 5:15-CV-00607-SVW-E, 2015 WL 12672094, at *4 (C.D. Cal. Oct. 22, 2015) (plaintiff's testimony regarding her severe headaches was sufficient to raise an issue of fact as to whether her headaches qualify her as disabled). "However, to survive summary judgment, an affidavit supporting the existence of a disability must not be merely self-serving and must contain sufficient detail to convey the existence of an impairment." Rohr, 555 F.3d at 860 (internal quotation marks omitted).

In a recent unpublished case, the Ninth Circuit Court of Appeals held that the district court erred by requiring the plaintiff to submit documentation of his disability when he submitted testimony consisting of more than "conclusory declarations". See Scott v. Mabus, 618 F. App'x 897, 900 (9th Cir. 2015). In Scott, the plaintiff provided his employer with a "Self-identification of Handicap" form in which he indicated a combination of "nonparalytic orthopedic impairments." Id. The plaintiff also submitted testimony that he had told several other employees about his past medical conditions and the limitations he faced due to his artificial hip. Id. The Court held that such evidence was sufficient to raise a triable issue of fact that the plaintiff may be disabled. Id.

As in Scott, Plaintiff here has submitted more than just conclusory declarations. Plaintiff's declaration describes in detail the ways in which dyslexia limits his ability to read and write, as well as the ways he has attempted to compensate for his disability. Plaintiff testified in his deposition about his disability and its impact on his life. He also testified about telling his supervisors and coworkers in an effort to obtain help. While Plaintiff's allegations of disability would certainly be stronger with a documented diagnosis, the Court finds that he has submitted sufficient evidence to raise an issue of fact regarding whether he is disabled.

For the same reasons, Plaintiff can establish an issue of fact as to whether he has a "record of a disability." To have a record of an impairment that substantially limits a major life activity means to have "a history of, or [have] been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k); see also 42 U.S.C. § 12102(2)(B); Coons v. Sec'y of U.S. Dep't of Treasury, 383 F.3d 879, 886 (9th Cir. 2004) ("[T]he record must be of an impairment that substantially limits a major life activity.") (internal quotation marks omitted).

In addition, Plaintiff can establish that Defendant regarded him as disabled. An individual is "regarded as" disabled if he "has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102. Plaintiff repeatedly requested accommodations for his dyslexia from Defendant—from his initial request for help filling out his employment paperwork to his daily requests for help in filling out his timecards. Plaintiff disclosed his dyslexia to Ms. Franklin and Mr. Cudd when he was hired, Mr. Crawford six months after he was hired, and Mr. Windsor and Mr. Goldspink on a regular basis. James Decl. ¶¶ 4-8.

Defendant seeks to undermine Plaintiff's claim that he was regarded as disabled by arguing that Mr. Goldspink did not believe that Plaintiff is dyslexic. Defendant submits portions of Plaintiff's deposition testimony in which Plaintiff testified that Mr. Goldspink made various statements suggesting that Mr. Goldspink did not believe Plaintiff was disabled. For example, Plaintiff testified that "[Mr. Goldspink] didn't believe that I had dyslexia, that I was playing stupid, and I was lazy." Pl. Depo. 79:24-80:1. Plaintiff also testified that Mr. Goldspink would

13 - OPINION & ORDER

tell him "that if I really had it, dyslexia, that I'd have proof of it" and that "the reason why I could not get put into paint is because I claimed that I had dyslexia, and that I could not read the paint containers, and that was me just playing stupid and lazy." Id. at 80:6-81:10.

However, notwithstanding Plaintiff's testimony, there is no question that, at a minimum, there is an issue of fact as to whether Defendant regarded Plaintiff as dyslexic. Mr. Goldspink testified in his deposition that he knew Plaintiff is dyslexic. Burgess Decl. Ex. H ("Goldspink Depo.") 56:24-57:5, ECF 42-8. He later testified that he did not dispute that Plaintiff has dyslexia and he did not think Plaintiff was "faking it." Id. at 65:18. He also testified that Plaintiff had told him he had a learning disability. Id. at 90:22. Finally, Mr. Goldspink testified that when he told Plaintiff he thought he was "faking it," he was actually just "giving him shit" and engaging in "back and forth bantering." Id. at 101:1-24. These facts allow an inference that Defendant regarded Plaintiff as disabled.[2]

In sum, the Court rejects Defendant's effort to challenge Plaintiff's ability to establish that he has a disability, as defined by the ADA. The Court proceeds to delve deeper into each of Plaintiff's theories for relief under the ADA and the ORA.

### B. Hostile Work Environment

As part of Plaintiff's first and third claims, he alleges that he was subjected to a hostile work environment based on his disability. While the Ninth Circuit has not recognized a claim for

---

[2] Defendant also argues that, to succeed under this prong, Plaintiff "must show not only that the employer knew of [his] impairment, but that [he] was subject to prohibited discrimination because of the impairment." Def.'s Mot. 31, ECF 31 (citing DiGiosia v. Aurora Health Care, Inc., 48 F.Supp.3d 1211, 1218-19 (E.D. Wis. 2014) for the proposition that it is proper to consider the causation question during the initial analysis of whether a plaintiff is regarded as having a disability). The Court agrees that Plaintiff must show causation; however, the Court addresses that prong later in this Opinion. See DiGiosia, 48 F. Supp. at 1219, n.5 (noting that the debate regarding when to address causation in the summary judgment analysis for "regarded as" disability claims "could be purely academic").

hostile work environment under the ADA, in a recent unpublished opinion the Court assumed

"arguendo, that hostile work environment claims are cognizable under the ADA," and proceeded

to analyze the claim using the standards set forth under Title VII harassment claims. Meirhofer v.

Smith's Food & Drug Centers Inc., 415 F. App'x 806, 807 (9th Cir. 2011). Further, cases in this

District have recognized a hostile work environment claim under the ADA and have applied a

Title VII analysis. See, e.g., Thomas v. Mettie, No. 3:14-CV-00554-SI, 2015 WL 667629, at *4

(D. Or. Feb. 17, 2015); Lucke v. Multnomah Cty., No. CV-06-1149-ST, 2008 WL 4372882, at

*38 (D. Or. Sept. 22, 2008) (finding the argument "persuasive" that the Court should fail to

recognize an ADA hostile work environment claim, but nevertheless analyzing the claim under

the Title VII framework) aff'd in part, 365 F. App'x 793 (9th Cir. 2010); Sandy v. Potter, No.

CIV. 06-6081-HO, 2008 WL 4058002, at *2 n.1 (D. Or. Aug. 26, 2008); Mitchell v. Tri-Cty.

Metro. Transp. Dist., No. 04-CV-1359-BR, 2005 WL 3447941, at *7 (D. Or. Dec. 15, 2005) ("If

such a cause of action exists, therefore, the elements would be similar to those required under the

Title VII framework."). In addition, Defendant does not challenge Plaintiff's ability to assert

such an ADA hostile work environment claim.

    However, even if this Court were to recognize such a cause of action, Plaintiff's claim

fails. Plaintiff must raise a triable issue of fact as to whether (1) he was subjected to verbal or

physical conduct because of his disability, (2) the conduct was unwelcome, and (3) the conduct

was sufficiently severe or pervasive to alter the conditions of his employment and create an

abusive work environment. Manatt v. Bank of Am., NA, 339 F.3d 792, 798 (9th Cir. 2003)

(setting forth elements for hostile work environment claims under Title VII). Plaintiff is unable

to satisfy his burden as to the third prong of the analysis.

15 - OPINION & ORDER

Here, it is undisputed that Plaintiff was subjected to at least some number of comments from Mr. Goldspink about his dyslexia and that such conduct was unwelcome. Therefore, the Court focuses on whether Plaintiff can raise an issue of fact as to whether Mr. Goldspink's conduct was "sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive work environment." Manatt, 339 F.3d at 798. The Court considers whether the workplace was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Nichols v. Azteca Rest. Enterprises, Inc., 256 F.3d 864, 871–72 (9th Cir. 2001) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998)).

To determine whether a working environment was abusive, the Court "must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Davis v. Team Elec. Co., 520 F.3d 1080, 1095 (9th Cir. 2008) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). "No single factor is required and the required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." Id. (internal quotation marks and citation omitted). A working environment is abusive if "hostile conduct pollutes the victim's workplace, making it more difficult for [him] to do her job, to take pride in [his] work, and to desire to stay on in [his] position." Id.

"[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher, 524 U.S. at 788. For example, in Manatt, the Ninth Circuit held that the Chinese-

American plaintiff was not subjected to a hostile work environment, even though her coworkers made jokes about "China man," ridiculed her pronunciation of words in English, and pulled their eyes back with their fingers to mock the appearance of Asians. 339 F. 3d at 798. Similarly, there was no hostile work environment when a supervisor called female employees "castrating bitches," "Madonnas," or "Regina" on several occasions in plaintiff's presence; the supervisor called the plaintiff "Medea"; the plaintiff complained about other difficulties with that supervisor; and the plaintiff received letters at home from the supervisor. <u>Kortan v. Cal. Youth Authority</u>, 217 F.3d 1104, 1111 (9th Cir. 2000). And in another case, there was no hostile work environment when the employee was told he had "a typical Hispanic macho attitude," he should work in the field because "Hispanics do good in the field," and he was yelled at in front of others. <u>Vasquez v. County of Los Angeles</u>, 307 F.3d 884, 893 (9th Cir. 2002) (noting that in <u>Sanchez v. City of Santa Ana</u>, 936 F. 2d 1027 (9th Cir. 1990) the court held "no reasonable jury could have found a hostile work environment despite allegations that the employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs because they were Latino").

In contrast, the Ninth Circuit held in <u>Draper v. Coeur Rochester, Inc.</u> that a work environment was hostile when the plaintiff's supervisor made repeated sexual remarks about the plaintiff over a two-year period, calling her "gorgeous" and "beautiful" rather than her name, telling her about his sexual fantasies and his desire to have sex with her, commenting on her "ass," and asking over a loudspeaker if she needed help changing clothes. 147 F.3d 1104 (9th Cir. 1998). Likewise, in <u>Nichols v. Azteca Restaurant Enterprises, Inc.</u> a male employee faced a

17 - OPINION & ORDER

hostile workplace when he was subjected to a relentless campaign of insults, name-calling,

vulgarities, and taunts of "faggot" and "fucking female whore" by male coworkers and

supervisors at least once a week and often several times a day. 256 F.3d 864 (9th Cir. 2001). And

in McGinest v. GTE Service Corp., a hostile work environment existed when the plaintiff's

supervisors failed to maintain his automobile because of his race, causing him to be involved in a

serious auto accident and, in addition, subjected him to extreme racial insults such as "stupid

nigger." 360 F.3d 1103, 1114–15 (9th Cir. 2004). McGinest was prevented from collecting

overtime pay for time he worked and his "ability to perform his job was directly affected by the

refusal of his coworkers to work under his direction." Id.

    Here, Plaintiff's claim is entirely based upon how he was treated by Mr. Goldspink. See

Pl. Depo. 95:11-15 (confirming that he did not believe anybody else discriminated against him

on the basis of disability). Mr. Goldspink admits that he "gave [Plaintiff] shit" about being

dyslexic on at least two occasions. Goldspink Depo. 100:18-104:5. Plaintiff specifically

describes three incidents with Mr. Goldspink and then generally alleges that "[t]hroughout 2012,

2013, and 2014,[3] Goldspink he [sic] would bring up my disability and accuse me of being lazy

and mock me for my dyslexia on a weekly basis." James Decl. ¶ 10. According to Plaintiff, Mr.

Goldspink "would joke about my disability to get others to laugh at my expense." Id. at ¶ 8.

    As to the specific incidents alleged by Plaintiff, the first occurred in July of 2012, while

Plaintiff was in the break room with other employees. Id. at ¶ 8. Mr. Goldspink instructed

Plaintiff to fill out some paperwork. Id. Plaintiff asked for assistance and Mr. Goldspink

---

[3] Defendant submits an evidentiary challenge to Plaintiff's declaration that the comments continued
through April of 2014, as opposed to September of 2013, as Plaintiff alleged in his BOLI complaint. It is
not necessary for the Court to resolve this issue, because even if the comments continued until April of
2014, Plaintiff fails to raise an issue of fact as to whether he was subjected to a hostile work environment.

responded: "Here is a printout from the office. Figure it out on your own." Id. Plaintiff told Mr. Goldspink that he is dyslexic and that he could not fill out the paperwork without assistance. Id. Mr. Goldspink called Plaintiff "stupid" and "lazy." Id. He threw the job sheet back at Plaintiff and said "figure it out on your own." Id. The second incident occurred in October or November of 2012, when Mr. Goldspink again called Plaintiff lazy and stupid. Id. at ¶ 9. Plaintiff stated that he could provide proof of his disability. Id. Mr. Goldspink responded by telling Plaintiff that if he could not fill out his timecard, he "did not need a job." Id. at ¶ 9. The third specific incident occurred in October of 2012, when Mr. Goldspink stated: "I don't even know why you want to go into paint. I can't believe you want to move into paint when you can't even read paint labels. Why would they consider moving you when you can't read the paint colors?"

The Court believes this is a close case. Even though repeated derogatory or humiliating statements can constitute a hostile work environment, the cases illustrated above demonstrate the high standard Plaintiff must meet to adequately raise an issue of fact. Certainly, the three specific incidents Plaintiff describes would not suffice to establish a hostile work environment, in the absence of any other aggravating circumstances. See e.g., Equal Employment Opportunity Comm'n v. Swissport Fueling, Inc., 916 F. Supp. 2d 1005, 1022 (D. Ariz. 2013) ("Being subject to an offensive term, even a racial slur, on three separate occasions does not, as a matter of law, reach the level of severity sufficient to create an issue of fact as to whether a hostile work environment existed.").

The question, however, is whether the "weekly" comments from Mr. Goldspink transform Plaintiff's experience from one involving a handful of isolated insults to one that rises to the level of a hostile work environment. The Court concludes that they do not. Plaintiff was

19 - OPINION & ORDER

never physically threatened, nor did Mr. Goldspink's comments constitute "a relentless

campaign of insults, name-calling, and vulgarities." <u>Nichols</u>, 256 F.3d 864 (noting that the abuse

occurred at least once a week and often several times a day). Furthermore, there is no indication

that the harassment unreasonably interfered with Plaintiff's work performance. Plaintiff testified

as follows:

> Q. Did you ever miss any work as a result of anything Mr. Goldspink said to you regarding dyslexia or a learning disability?
>
> A. No.
>
> Q. And did it have any impact on your ability to do your job?
>
> A. No.
>
> ***
>
> Q. And you were always able to perform your job duties despite whatever Mr. Goldspink had said to you; correct?
>
> A. Yep.
>
> Q. Did anyone else at Oregon Sandblasting make any comments to you that you felt were a form of harassment based on dyslexia or learning disability?
>
> A. No.

Pl. Depo. 84:1-85:10.

The Court accepts Plaintiff's statement that Mr. Goldspink's comments made him

extremely upset and caused him to lose sleep.[4] James Decl. ¶ 10. Plaintiff declares that he felt

---

[4] Defendant objects to the admission of Plaintiff's statements regarding the emotional impact of Mr. Goldspink's comments. Defendant invokes the "sham" affidavit rule, which establishes that "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991). However, the sham affidavit rule does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony. <u>Id.</u> at 266-67. The rule is concerned with "sham" testimony that flatly contradicts earlier testimony in an attempt to "create" an issue of fact and avoid summary judgment. <u>Id.</u> at 267. Cases have emphasized that the inconsistency between a party's deposition testimony and subsequent

20 - OPINION & ORDER

like a less-valued employee because of his disability. Id. Plaintiff also testified that, due to his interactions with Mr. Goldspink, he felt angry and worried about losing his job. Burgess Decl. Ex. A (Pl. Depo. II) 174:16-25, ECF 51-1. Plaintiff has demonstrated a subjective belief that the work environment was abusive. However, this subjective belief does not overcome the Court's conclusion that, as a matter of law, Plaintiff fails to establish that the workplace was objectively hostile. Accordingly, the Court grants Defendant's motion for summary judgment on Plaintiff's hostile work environment claim.

C.  Disability Discrimination

To oppose summary judgment in a discrimination claim, Plaintiff has the initial burden of making out a prima facie case of discrimination. To establish a prima facie case of disability discrimination, Plaintiff must show that (1) he is disabled; (2) he is a qualified individual as defined in the statute; and (3) he suffered an adverse employment action because of his disability. Smith v. Clark Cty. Sch. Dist., 727 F.3d 950, 955 (9th Cir. 2013). If Plaintiff establishes a prima facie case of disability, the Court applies the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Snead, 237 F.3d at 1092-94 (applying the burden-shifting analysis of McDonnell Douglas to ADA claims of employment discrimination); see also Mayo v. PCC Structurals, Inc., 795 F.3d 941, 943 (9th Cir. 2015) ("We apply the familiar burden-shifting framework outlined in McDonnell Douglas . . . to claims under Oregon disability law"). The burden shifts to Defendant to provide a legitimate, non-discriminatory reason for the adverse employment action. Curley v. City of N. Las Vegas,

---

affidavit must be clear and unambiguous to justify striking the affidavit. Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998-99 (9th Cir. 2009). The Court compares Plaintiff's deposition testimony and declaration and concludes that any inconsistencies result from expanding upon prior testimony rather than intentionally creating an issue of fact. Thus, the Court overrules Defendant's evidentiary objection.

772 F.3d 629, 632 (9th Cir. 2014). If Defendant does so, then the burden shifts back to Plaintiff

to prove that the reason given by the employer was pretextual. Id.

        1.   Prima facie case

As discussed above, there is at least a genuine issue of fact as to whether Plaintiff is

disabled. Assuming that he is, Defendant concedes that Plaintiff is a qualified individual as

defined in the statute. Therefore, the issue is whether Plaintiff suffered an adverse employment

action because of his disability.

For a disparate treatment claim, an adverse employment action "materially affect[s] the

compensation, terms, conditions, or privileges of . . . employment." Davis, 520 F.3d 1080

(quoting Chuang v. Univ. of Cal. Davis, Bd. of Trustees, 225 F.3d 1115, 1126 (9th Cir. 2000)).

Plaintiff alleges that he suffered an adverse employment action when Defendant refused his

requests to be moved to a painting position within the company. Plaintiff declares that painting

was a more desirable position than sandblasting because painters earned more, the work was less

physically demanding and occurred indoors, and opportunities for advancement were greater.

James Decl. ¶ 12. He testified in his deposition that it was his understanding that painters made

more money than sandblasters, Pl. Depo. at 109:3. He submits evidence of employees' wages

that he contends shows that painters, on average, earn more that sandblasters. Burgess Decl. Ex.

F, ECF 42-7. According to Plaintiff, other non-disabled sandblasters were assigned to work as

painters, despite having no experience painting. James Decl. ¶ 14.

Defendant contends that the decision to keep Plaintiff as a sandblaster cannot be an

adverse action because there was no difference in wages or benefits between the two positions.

Defendant submits the declaration of Mr. Cudd, who states that painting is not a promotion from

sandblasting, the two positions pay the same, and both sandblasters and painters are paid according to their skills and experience. Cudd Decl. ¶ 10-12, ECF 32. Defendant also disputes the conclusions Plaintiff draws from the evidence of other employees' wages.

Keeping in mind that the evidence required at this stage is minimal, the Court finds that Plaintiff meets his burden of showing there is an issue of fact as to whether he suffered an adverse action. See Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994), as amended on denial of reh'g (July 14, 1994) ("The amount of evidence that must be produced in order to create a *prima facie* case is 'very little.'") (quoting Sischo–Nownejad v. Merced Comm. Coll. Dist., 934 F.2d 1104, 1111 (9th Cir. 1991)). First, the evidence is not conclusive regarding whether painters earn more than sandblasters. Second, even if Plaintiff cannot claim an adverse action based on pay differential, he alleges other differences between the two positions that could constitute material differences in the terms and conditions of employment.

The denial of the benefit of working indoors in a less physically strenuous environment could constitute an adverse employment action in certain circumstances. See, e.g., Marquez v. Harper Sch. Dist. No. 66, No. CV-09-1254-SU, 2011 WL 2462035, at *10 (D. Or. Mar. 24, 2011), ("Assignment of more strenuous work, work with hazardous substances, and exclusion from important areas in the workplace have been found sufficient to establish a *prima facie* case.") (internal quotation marks omitted) Findings and Recommendation adopted, No. 2:09-CV-01254-SU, 2011 WL 2516165 (D. Or. June 17, 2011). Similarly, just as the Ninth Circuit has held that being stripped of work responsibilities could be an adverse employment action, this Court finds that the denial of opportunities for advancement or desirable work responsibilities can qualify as an adverse employment action as well. See Kortan, 217 F.3d at 1113; Daniel v.

23 - OPINION & ORDER

Boeing Co., 764 F. Supp. 2d 1233, 1241 (W.D. Wash. 2011) ("Although Boeing did not permanently assign plaintiff to light duty or reduce her pay, '[a] job transfer may constitute an adverse job action even where the pay and benefits are identical if there is a reduction in other terms, conditions, or privileges of employment.'"). Thus, there is an issue of fact as to whether Defendant's refusal to allow Plaintiff the opportunity to train and transfer to painting was an adverse employment action.

However, it is not enough for Plaintiff to simply establish that he suffered an adverse employment action. He must show that he suffered such action because of his disability. In his Response to the Motion for Summary Judgment, Plaintiff fails to argue that he suffered an adverse action because of his disability and, instead, jumps to the final stage of the burden-shifting analysis, in which he must show that Defendant's proffered non-discriminatory reason for the adverse action is pretext for discrimination. However, the Court finds it reasonable to infer that Plaintiff would assert the same evidence he presents as pretext in arguing that he was denied the opportunity to train and transfer to painting because of his disability. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000) (noting that the evidence on which plaintiff relies on for a pretext argument does not need to be different than that which supports his *prima facie* case).

Proceeding under that assumption, the Court notes that Plaintiff presents three pieces of evidence: (1) in October of 2012, Mr. Goldspink said to Plaintiff, "I don't know why you want to go into paint. I can't believe you want to move into paint when you can't even read paint labels. Why would they consider moving you when you can't read the paint colors?"; (2) in March of 2013, Mr. Goldspink stopped allowing Plaintiff to train as a painter and told him, "You're the

24 - OPINION & ORDER

one who screwed yourself out of the paint department because you keep playing up your disability that you can't read"; and (3) other non-disabled employees with no experience in painting were assigned to work on the paint side of operations. Taken together, such evidence is sufficient to establish Plaintiff's *prima facie* case that he was subject to an adverse action because of his disability. Mr. Goldspink's comments strongly suggest that Plaintiff was not allowed to continue training as a painter because of his disability.

### 2.   Legitimate non-discriminatory reason

The burden shifts to Defendant to put forth a legitimate, non-discriminatory reason for refusing to put Plaintiff in a paint position. Defendant advances several arguments, two of which can be disposed of quickly. First, Defendant claims that Plaintiff testified that nepotism, rather than disability status, was the primary reason why painting positions were given to other employees. However, Defendant mischaracterizes Plaintiff's testimony. Plaintiff testified that he believed two particular employees received preferential treatment because they were related to Mr. Goldspink <u>and</u> because they were not disabled. Pl. Depo. 96:25-97:2 ("Yeah, I do believe because they didn't have, you know, some type of disability, yes, I do believe that they were treated better."). Second, Defendant argues that Mr. Goldspink could not have discriminated against Plaintiff due to his disability because Mr. Goldspink did not believe Plaintiff to be disabled. The Court has already rejected Defendant's attempt at this argument.

What remains, therefore, is the testimony of Mr. Cudd, shop superintendent for Defendant. Plaintiff testified that he had several conversations with Mr. Cudd about moving from sandblasting to painting. Pl. Depo. 110:12-15. Mr. Cudd submits a declaration in which he testifies that Plaintiff was given an opportunity to learn to paint, but "he was only a mediocre

painter." Cudd Decl. ¶ 12. Mr. Cudd declares that "because OSB needed sandblasters (and

Plaintiff was already fully trained at that), he was not moved to a painting position." Id. at ¶ 13.

In addition, Mr. Cudd declares:

> I actually wanted to keep Plaintiff as a sandblaster because it was more difficult to find people to do that work and I felt Plaintiff was fairly good at it. Additionally, Plaintiff, due to his fairly large physical size, really did not have the physical agility necessary to be a successful painter.

Id. at ¶¶ 14-15. Through Mr. Cudd's declaration, Defendant satisfies its burden to present

evidence of a legitimate non-discriminatory reason for its adverse employment action.

### 3. Pretext

To survive summary judgment, Plaintiff must put forth evidence that, despite

Defendant's seemingly legitimate and non-discriminatory explanation, Defendant acted with

discriminatory animus, or its "proffered explanation is unworthy of credence." Texas Dep't of

Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981); Chuang, 225 F.3d at 1127. Plaintiff's

evidence of pretext is the same as the evidence that supports his prima facie case.

Drawing all reasonable inferences in Plaintiff's favor, the evidence is sufficient to raise

an issue of fact as to whether Defendant's purported reason is pretextual. Mr. Goldspink's

comments can be viewed as motivated, at least in part, by disability discrimination. See Siring v.

Or. State Bd. of Higher Educ. ex rel. E. Or. Univ., 977 F. Supp. 2d 1058, 1063 (D. Or. 2013)

(citing Head, 413 F. 3d at 1065 and applying the "motivating factor" standard to ADA

discrimination claims). Because Plaintiff alleges that Mr. Goldspink "stopped allowing [him] to

work on the paint side," a reasonable factfinder to conclude that the animus affected the

employment decision. Dominguez-Curry v. Nev. Transp. Dep't, 424 F.3d 1027, 1039–40 (9th

Cir. 2005) ("Where, as here, the person who exhibited discriminatory animus influenced or

26 - OPINION & ORDER

participated in the decisionmaking process, a reasonable factfinder could conclude that the animus affected the employment decision."). Furthermore, Defendant does not offer any evidence to refute Plaintiff's assertion that the favorable treatment of two coworkers was due, in part, to the fact that they were not disabled. In sum, Plaintiff's claims of disability discrimination survive summary judgment.

> D.  Failure to accommodate/engage in the interactive process

Plaintiff alleges that Defendant failed to engage in the interactive process to find a reasonable accommodation for his disability. Engaging in the interactive process is not an independent cause of action under the ADA; rather, it is part of an employer's duty to accommodate. See Randle v. Tri-Cty. Metro. Transp. Dist. of Oregon, 171 F. Supp. 3d 1084, 1089 (D. Or. 2016); see also Stern v. St. Anthony's Health Ctr., 788 F.3d 276, 292 (7th Cir. 2015). The failure to provide a reasonable accommodation to a qualified individual with a disability can constitute discrimination under the ADA. 42 U.S.C. § 12112(b)(5)(A); Kaplan v. City of N. Las Vegas, 323 F.3d 1226, 1232 (9th Cir. 2003).

"The interactive process is triggered either by a request for accommodation by a disabled employee or by the employer's recognition of the need for such an accommodation." Snead, 237 F.3d at 1087 n. 6. An employee is not required to use any particular language when requesting an accommodation but need only "inform the employer of the need for an adjustment due to a medical condition." Zivkovic v. S. California Edison Co., 302 F.3d 1080, 1089 (9th Cir. 2002).

This interactive process requires: "(1) direct communication between the employer and employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective." U.S.

E.E.O.C. v. UPS Supply Chain Sols., 620 F.3d 1103, 1110-11 (9th Cir. 2010). The ADA and the

OADA require the same interactive process. Roloff v. SAP Am., Inc., 432 F.Supp.2d 1111, 1122

(D. Or. 2006). Liability for failure to provide reasonable accommodations ensues only where the

employer bears responsibility for the breakdown in the interactive process. Zivkovic, 302 F.3d at

1089.

To establish a prima facie case for failure to accommodate under the ADA, Plaintiff must

show that (1) he is disabled within the meaning of the ADA; (2) he is a qualified individual able

to perform the essential functions of the job with reasonable accommodation; and (3) he suffered

an adverse employment action because of his disability." Samper v. Providence St. Vincent Med.

Ctr., 675 F.3d 1233, 1237 (9th Cir. 2012).

Plaintiff alleges that Defendant knew from the day he was hired that he could not read or

write. He further contends that Defendant failed to accommodate him by refusing to assist him

fill out his timecards and by refusing to train and transfer him to a paint position because of his

inability to read paint cans.

The first part of Plaintiff's claim fails because there is no evidence that he suffered any

adverse employment action due to his inability to fill out the timecards. Mr. Goldspink's failure

to help Plaintiff and Defendant's failure to engage in the interactive process with Plaintiff around

his time cards, while certainly insensitive, is not itself an adverse employment action because it

did not result in any materially adverse changes in the terms and conditions of Plaintiff's

employment.

On the other hand, by refusing to allow Plaintiff to train in the paint position, Defendant

failed to engage in the interactive process to accommodate his inability to read paint labels and,

thus, subjected Plaintiff to an adverse employment action because he did not have the opportunity to perform this more desirable job. Therefore, Defendant's motion for summary judgment on Plaintiff's reasonable accommodation claim is denied.

    E.   Retaliation

Plaintiff claims that Defendant retaliated against Plaintiff by refusing to move him to a paint position because he reported his disability to Mr. Goldspink and requested accommodations for his disability. To state a prima facie case of retaliation, a plaintiff must allege "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." Alvarado v. Cajun Operating Co., 588 F.3d 1261, 1269 (9th Cir. 2009) (citation and quotation marks omitted). The plaintiff must present "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996) (emphasis modified).

    In other words, Plaintiff must establish a link between his request for a reasonable accommodation and the denial of his request to be put in the paint position. Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000). Once the plaintiff establishes a *prima facie* case, the employer has the burden to "present legitimate reasons for the adverse employment action." Id. If the employer carries this burden, and plaintiff demonstrates a genuine issue of material fact as to whether the reason advanced by the employer was a pretext, then the retaliation case proceeds beyond the summary judgment stage. Id.

Viewing the facts in the light most favorable to Plaintiff, he was involved in protected activity by telling Mr. Goldspink that he needed help filling out paperwork as an accommodation

29 - OPINION & ORDER

for his disability. See Coons v. Sec'y of U.S. Dep't of Treasury, 383 F.3d 879, 887 (9th Cir. 2004) (requesting a reasonable accommodation is a protected activity).

In an ADA retaliation claim, "[a]n adverse employment action is any action 'reasonably likely to deter employees from engaging in protected activity.'" Pardi v. Kaiser Found. Hosps., 389 F.3d 840, 850 (9th Cir. 2004). As already discussed in this opinion, the refusal to allow Plaintiff the opportunity to train and transfer to a painter position could be an adverse action because painting was a more desirable position than sandblasting. The prospect of being foreclosed from the opportunity to obtain a more desirable position could deter employees from engaging in protected activity.

The issue, therefore, is whether the Court can infer a causal link between Plaintiff requesting an accommodation from Mr. Goldspink and the refusal to allow Plaintiff to paint. The only evidence Plaintiff presents in support of his retaliation claim is Mr. Goldspink's statement: "You're the one who screwed yourself out of the paint department because you keep playing up your disability that you can't read." Pl.'s Resp. 30, ECF 41 (citing James Decl. ¶ 17). While this is only one statement, it strongly supports Plaintiff's theory that Plaintiff was not allowed to paint because he had requested accommodations for his disability from Mr. Goldspink. Therefore, Plaintiff establishes his *prima facie* case.

Defendant's reasons for not allowing Plaintiff to paint and Plaintiff's ability to show pretext have already been discussed above. Thus, Defendant's motion for summary judgment on Plaintiff's retaliation claim is denied.

///

30 - OPINION & ORDER

**III.    Injured worker discrimination and retaliation—Claim 4**

Plaintiff's final claim alleges that Defendant discriminated and retaliated against him due to his work-related injury, in violation of O.R.S. 659A.040. Under ORS 659A.040(1), "[i]t is an unlawful employment practice for an employer to discriminate against a worker with respect to hire or tenure or any term or condition of employment because the worker has applied for benefits or invoked or utilized the procedures provided for in ORS chapter 656 or has given testimony under the provisions of those laws."

To establish a prima facie case under ORS 659A.040(1), a plaintiff must show: "(1) that the plaintiff invoked the workers' compensation system; (2) that the plaintiff was discriminated against in the tenure or conditions of employment; and (3) that the employer discriminated against the plaintiff in the tenure or terms of employment because he or she invoked the workers' compensation system." Anderson v. Hibu, Inc., 26 F. Supp. 3d 1019, 1025 (D. Or. 2014) (quoting Kirkwood v. W. Hyway Oil Co., 204 Or. App. 287, 293, 129 P.3d 726, 729 (2006)).

A.  Invocation of workers' compensation system

On two occasions, in May and October of 2013, Plaintiff injured himself at work and reported the injury to Mr. Goldspink. Thus, it is undisputed that Plaintiff invoked the workers' compensation system. See Herbert v. Altimeter, Inc., 230 Or. App. 715, 726, 218 P.3d 542, 548 (2009) (invoking Oregon's workers' compensation system does not require a formal claim but, rather, includes a worker's reporting of an on-the-job injury or "a perception by the employer that the worker has been injured on the job or will report an injury"). However, Defendant challenges Plaintiff's ability to establish the second and third prongs of his *prima facie* case.

B.  Discrimination in the tenure or conditions of employment

31 - OPINION & ORDER

Plaintiff alleges that he establishes the second prong of his *prima facie* case because he faced two adverse employment actions: (1) after Plaintiff reported his injuries to Mr. Goldspink, he was told twice that he would be fired if he filed a workers' compensation claim, and (2) Plaintiff was constructively discharged when he quit because he needed to file a workers' compensation claim but did not want to be fired.

As to the threats from Mr. Goldspink in May and October of 2013, the parties appear to agree that the May incident is time-barred. Plaintiff filed a complaint with the Oregon Bureau of Labor and Industries (BOLI) on July 11, 2014 and, thus, his claims must be based on unlawful employment practices occurring no earlier than July 11, 2013. See O.R.S. 659A.875(1) and 659A.820(2) (BOLI complaints must be filed within one year of the allegedly unlawful practice). However, the threat made in October of 2013 is not time-barred and could clearly constitute discrimination in the conditions of Plaintiff's employment. See, e.g., Strother v. S. California Permanente Med. Grp., 79 F.3d 859, 870 (9th Cir. 1996), as amended on denial of reh'g (Apr. 22, 1996), as amended on denial of reh'g (June 3, 1996) (evidence that employee was warned not to file a discrimination charge could be considered actual evidence of employer's discriminatory motive); Hunt v. City of Portland, 726 F. Supp. 2d 1244, 1260 (D. Or. 2010) ("Threats of termination in the event the employee continues to report misconduct . . . are clearly adverse and would likely dissuade a reasonable employee from engaging in such protected activities.) aff'd, 496 F. App'x 751 (9th Cir. 2012), and aff'd, 599 F. App'x 620 (9th Cir. 2013)

It is a closer call whether or not Plaintiff's resignation can be considered a constructive discharge and, thus, discrimination in the tenure of his employment. In order to establish that an

32 - OPINION & ORDER

employee was constructively discharged under Oregon law, a plaintiff must allege and prove that:

> (1) the employer intentionally created or intentionally maintained specified working condition(s);
>
> (2) those working conditions were so intolerable that a reasonable person in the employee's position would have resigned because of them;
>
> (3) the employer desired to cause the employee to leave employment as a result of those working conditions *or* knew that the employee was certain, or substantially certain, to leave employment as a result of those working conditions; and
>
> (4) the employee did leave the employment as a result of those working conditions.

McGanty v. Staudenraus, 321 Or. 532, 557, 901 P.2d 841, 856–57 (1995). The determination of whether conditions are "so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question left to the trier of fact." Garmon v. Plaid Pantries, No. 3:12-CV-1554-AC, 2013 WL 3791433, at *26 (D. Or. July 19, 2013) (citing Thomas v. Douglas, 877 F. 2d 1428, 1434 (9th Cir. 1989)).

Plaintiff contends that, by April of 2014, he was no longer able to tolerate the pain of working with the injuries he previously sustained. James Decl. ¶ 20. He wanted to receive medical treatment but, because he had been informed that he would be terminated if he filed a workers' compensation claim, he feared being fired and suffering the consequences of having a termination in his employment history. Id. at ¶ 21. Thus, he felt that he had no alternative but to resign. Id. at ¶ 20. Plaintiff declares that "I would not have quit my job . . . if it had not been for Goldspink's threats to terminate my employment if I filed a workers' compensation claim." Id. at ¶ 22. Another former employee, James McClara, corroborated Plaintiff's account of one of Mr. Goldspink's comments when he testified in his deposition that Mr. Goldspink told Plaintiff not to

file a claim or he would "be in jeopardy." Burgess Decl. Ex. I (McClara Depo.) 48:12-24, ECF 42-9.

Viewing the evidence in the light most favorable to Plaintiff, he establishes the factors of his allegation of constructive discharge. Plaintiff meets the first factor because Mr. Goldspink told him he would be terminated if he filed a workers' compensation claim. Thus, Mr. Goldspink intentionally created a working condition where Plaintiff worked despite pain from on-the-job injuries because he feared termination. He also satisfies the fourth factor—he presents evidence through his declaration that he did resign as a result of that working condition. James Decl. ¶ 22.

The question of whether Plaintiff can establish the second and third factors—whether a reasonable person would have resigned because of the working condition and whether the employer was substantially certain that the employee would leave because of the working condition—is less clear. Two cases cited from this District that apply Oregon law are instructive.[5]

In <u>Dunn v. Reynolds Sch. Dist. No. 7</u>, the court found that two school principals were constructively discharged when they were told they would be fired if they did not, in a short amount of time, pay thousands of dollars back that had allegedly been overpaid to them by the school district's medical reimbursement program. No. CV-09-1259-HU, 2010 WL 4718781 at *6-7 (D. Or. Nov. 15, 2010). The choice presented to the principals, "[p]ay us back or be fired," was viewed as the equivalent to a forced resignation in which employer had decided that the

---

[5] Plaintiff also cites <u>Kalvinskas v. California Inst. of Tech.</u>, 96 F.3d 1305 (9th Cir. 1996), a case in which the Ninth Circuit held that the employer coerced Kalvinskas into retiring when it made him choose between retiring and receiving his pension or remaining employed, but having the disability benefits he was receiving reduced to nothing. 96 F.3d at 1308. While the Court agrees that <u>Kalvinskas</u> supports Plaintiff's arguments, because it was not decided under Oregon law, the Court does not rely on its holding.

employment relationship was at an end and was merely selecting "the manner in which the employer's will is accomplished." Id. After analyzing the principals' claims under Oregon law, the court held that there was an issue of material fact as to whether their resignations were actually discharges.

In Hunt, a police officer resigned after several of her supervisors told her that she would lose her job if she continued to report officer misconduct while she was still on probation and suggested that "she should not be surprised if she did not receive backup" from the other officers. 726 F. Supp. 2d at 1263-64. The court applied the test from McGanty v. Staudenraus and held:

> While the conduct attributable to the City is not sufficiently egregious as to shock the conscience or clearly fall [sic] qualify as intolerable, viewing the evidence in the light most favorable to Hunt, the nonmoving party, the court finds that a reasonable person could find the conditions Hunt was facing intolerable. Hunt's job as a probationary police officer was risky enough under the best circumstances, but to add the possibility that Hunt would not receive the assistance of fellow officers in a time of need makes it even more potentially dangerous. Coupling this concern with the likelihood that she would lose her job if she continued to report police misconduct or criminal activity even further supports the claim that Hunt was reasonable in resigning because of her work conditions.

Id. In addition, because Hunt told several of her supervisors that she would not acquiesce to their demands that she stop reporting incidents of officer misconduct, the court held that "a trier of fact could find that the City knew that Hunt was likely to resign based on the threats to her safety and on its requirement that Hunt keep quiet or be terminated." Id. at 1264-65.

As in Dunn and Hunt, the Court finds that a reasonable person could find that the condition Plaintiff faced was intolerable. Defendant argues that this is not a case where "Plaintiff was forced to continue working while suffering painful on-the-job injuries." Def.'s Reply 23, ECF 48. However, this is exactly what Plaintiff declares happened. Due to Plaintiff's fear of

filing a workers' compensation claim, he continued working despite increasing pain in his back and shoulders. James Decl. ¶ 20. By April of 2014, the pain was intolerable and Plaintiff felt that he needed to file a claim in order to receive treatment. Id. at ¶ 21.

Taking the facts as alleged by Plaintiff, Mr. Goldspink told him directly that if he engaged in the protected activity of filing a workers' compensation claim, he would be fired. Thus Plaintiff was faced with a choice that had been created by Mr. Goldspink: work despite his injuries, file a claim and be fired, or resign. A fact-finder could conclude that this was a false choice where the only viable possibility was for Plaintiff to resign. In other words, by giving Plaintiff that choice, Defendant could be substantially certain that Plaintiff would resign. Therefore, Plaintiff satisfies the second and third prongs of his constructive discharge claim. There is at least a question of fact as to whether Mr. Goldspink's conduct effectively constructively discharged Plaintiff.

C.  Causation

Defendant argues that Plaintiff cannot establish a causal link between the adverse employment actions and his invocation of the workers' compensation system because Mr. Goldspink's comments were made in May and October of 2013, but Plaintiff did not resign until April of 2014. However, timing is not an issue in this case. The first adverse action Plaintiff alleges occurred in October of 2013, when Mr. Goldspink responded to Plaintiff's report of an injury with a threat. Clearly, in that case the adverse action followed closely on the heels of the protected activity. As to the constructive discharge, Plaintiff alleges that the working condition imposed by Mr. Goldspink became intolerable in April 2014 due to Plaintiff's "increasing pain in [his] back and shoulders." James Decl. ¶ 20. At that point, Plaintiff was constructively

36 - OPINION & ORDER

discharged because of Mr. Goldspink's actions. The fact that Mr. Goldspink had made his

comments several months earlier does not break the causal connection, given that there is no

evidence that Mr. Goldspink's message changed over time. At a minimum, Plaintiff presents an

issue of fact as to causation. In sum, Defendant's motion for summary judgment on this claim

fails.

## CONCLUSION

The Court grants Defendant's motion for summary judgment [31] on Plaintiff's hostile

work environment claim and otherwise denies Defendant's motion. The parties are ordered to

submit a Pretrial Order within 14 days of the date below.

IT IS SO ORDERED.

DATED this _____4_____ day of _____December_____, 2016.


_____
MARCO A. HERNÁNDEZ
United States District Judge